Spooner *v.* Brooklyn City Rail Road Company.

———•◦•———

## SPOONER *vs.* THE BROOKLYN CITY RAIL ROAD COMPANY.

No action will lie against another to recover damages for a personal injury, where it appears that the carelessness and imprudence of the plaintiff contributed to the injury.

Thus, where the plaintiff, with knowledge that an omnibus sleigh, belonging to the defendant, was full of passengers, stopped the same, and voluntarily and deliberately placed himself upon the fender, on the outside of the sleigh — a place not made or intended for passengers, but designed as a defense to the sleigh — although warned by a fellow passenger of the danger of the position, where he was injured by a collision with another vehicle : *Held* that whatever might have been the misconduct of the defendant in other respects, the plaintiff was guilty of gross imprudence and misconduct himself, which either caused or contributed to the injury ; and that he could not recover damages for such injury.

THIS was an appeal from a judgment of the city court of Brooklyn in favor of the plaintiff, for $5453.62, and from an order of that court denying a new trial, applied for, on the ground that the verdict was against evidence, and the damages excessive. The action was brought to recover damages for an injury sustained by the plaintiff while a passenger upon

one of the omnibus sleighs of the defendants, in the city of Brooklyn, in consequence of a collision with another sleigh.

*John Greenwood,* for the plaintiff.

*G. T. Jenks,* for the defendant.

*By the Court,* BROWN, J.    The case of *Caldwell* v. *Murphy,* (1 *Duer,* 233,) and that of *Carroll* v. *The New York and New Haven Rail Road Co.,* (*Id.* 571,) so much relied upon by the plaintiff on the argument of this appeal, are not authorities in his favor.    In regard to the agency of the plaintiff in bringing about the event which is the subject of the action, there is little, if any, resemblance.    In the first case the plaintiff was a passenger, riding upon the top of the defendant's stage, from which he was thrown and injured in consequence of the stage being carelessly driven against a large stone and overturned.    It appeared from the evidence that there were seats upon the top of the stage, where passengers habitually rode, and that the presence of the plaintiff at the place from which he was thrown did not cause or contribute to the accident in any way.    The court very properly held that the plaintiff was guiltless of the negligence which caused the injury.    In the case of *Carroll* v. *New York and New Haven Rail Road Co.* the plaintiff's injury resulted from the collision of two trains of the defendant's cars running in opposite directions.    The defendants relied, as a defense, upon the plaintiff being, at the time of the accident, in the post office apartment of the baggage car, a place much more dangerous, in the event of a collision, than the passenger cars, and forbidden to the passengers by a printed notice to that effect, posted up in the car.    The court held that the existence of this fact did not bring the plaintiff within the rule " that whenever it appears that the plaintiff's negligence or wrongful act had a material effect in producing the injury, or contributed towards it, he was not entitled to recover.    No care on his part could

Spooner *v.* Brooklyn City Rail Road Company.

have prevented the collision. No vigilance on his part after there were any grounds for apprehending a collision, could have saved him from injury. The collision, therefore, was wholly without any fault or negligence on his part, and by the collision he was injured. It was the duty of the defendants to employ the most scrupulous care and attention to prevent a collision of their trains running in opposite directions. The plaintiff was under no obligation to the defendants to select a location with a view to avoid the possible consequences of a neglect of that duty. A neglect of that duty would be generally regarded as imminently perilous to all the passengers on board. The defendants, at the time of the collision, were not in the lawful exercise of their rights." In the present case the defendants were in the lawful exercise of their rights, and if guilty of the negligence or inattention which brought their stage sleigh in contact with the coal sleigh referred to in the evidence, it was not the collision, exclusively, which caused the injury to the plaintiff, but the collision combined with the perilous position in which he had chosen to place himself. I entertain no doubt—no one who reads the evidence can entertain a doubt—that if the plaintiff had been inside of the body of the defendants' sleigh, in the place usually occupied by the passengers, he would have remained wholly unharmed, notwithstanding the collision.

The stage sleigh of the defendants, upon which the plaintiff was riding at the time of the accident, was drawn by six horses and attended by a driver and a conductor. It was from 20 to 25 feet long, and capable of seating from 28 to 30 passengers. There was no difference of opinion among the witnesses, as to the completeness and perfection of its construction. John Stephenson, a sleigh and omnibus maker since 1827, testified that it was of good materials and workmanship; "of the most approved mode of construction. It was of the best construction at the time it was built, and there has been no improvement since." No witness gave it any other character or description. It did not break down or give way in any par-

ticular, and no one pretended upon the trial that the accident was in any way attributable to the imperfect and insufficient construction of the vehicle upon which the plaintiff was riding. Indeed he does not charge any thing of the kind in his complaint. He only alleges, in respect to the sleigh, that it was crowded with passengers, and that he was compelled to ride on the outside thereof. In the preparation and construction of the means of conveyance, the defendants had done all that well directed skill could do, and they had fulfilled the conditions which the court of appeals announced as the rule in *Hegeman* v. *Western Rail Road Corporation*, (3 *Kern.* 9.)

In the third cause of action assigned in the complaint it is alleged that the collision with the coal sleigh was the result of the defendants' carelessness and negligence. This allegation, however, is not sustained by the evidence. There is no material variance in the testimony on this part of the case. The collision occurred on the 10th January, 1856, when the streets of the city were heavily burdened with snow. It was piled up on both sides of the street, where it had accumulated by that thrown from the sidewalks. The stage sleigh was on its way down Fulton street, having the right hand and east side of the track, while the coal sleigh was going in the opposite direction, having the westerly or southwesterly side of the street. The witnesses concur, generally, in saying that the stage sleigh was proceeding on its journey moderately and slowly, and that the coal sleigh was coming at a rapid pace. The occurrence is thus described by Leonard Beasley, the driver of the defendants' sleigh: "I saw the coal sleigh coming, and hauled my sleigh to the right, not very short. I took a steady course, so as to prevent my sleigh from slipping sideways. The other sleigh came on and kept slipping a little. When he got against us he gave his horse a short turn up the bank, towards the Clinton street side. His horse was coming on a good gait; he was jumping as though he was struck by something, or afraid. When he turned up Clinton street it threw the hind part of his sleigh right into mine and struck

my sleigh about the center, as near as I could judge. When I first saw the sleigh coming I was about the center of the street, and I turned out slowly so as to prevent my sleigh from slewing around." The plaintiff was himself examined as a witness in his own behalf, and furnished substantially the same account of the occurrence. He says: "I saw a horse coming up from the ferry; whether he was running away or not, I cannot say. He was going as fast as he could. The omnibus sleigh was going slow across the street. I drew in my feet and the coal sleigh slipped down upon the other sleigh. The stage horses were walking very slow, and the other horse was at the top of his speed. It was a coal sleigh, with an empty box. The omnibus sleigh was turning to the right, and the coal sleigh slid down against it. The stage sleigh occupied the middle of the road. It was about five or seven feet from the front of the sleigh to the curb. The hind part of the sleigh could not have been more than five or six feet from the curb." Again he says: "The stage sleigh did not lurch or slew towards the coal sleigh." S. M. Moore, a witness for the defendant, testified: "I was standing with the driver, in his seat. I saw the coal sleigh only a few minutes before the accident occurred. When the accident occurred, the hind part of the coal sleigh swung round. The horse of the coal sleigh turned in towards the walk as we were passing. The hind part struck in very short as if it slipped down the bank. The stage sleigh was turned in a little towards the right and the horses were going slow." Edward H. Puffer, another passenger on the stage sleigh, was examined as a witness, and said: "I did not see the sleigh until it was close to us. We were not going very fast. The head of the stage sleigh was a foot or a foot and a half turned out of the middle of the street to the right. The coal sleigh was coming at a pretty good rate, and as it got abreast of us it swung around and struck our sleigh just where Mr. Spooner was standing." There was other evidence to the same effect. I am thus particular in referring to the evidence, because it shows what has not been

seriously controverted, that the collision was not produced by any negligence or misconduct of the defendants' driver; that he was proceeding at a moderate and reasonable rate of speed along the street; that the stage sleigh was not driven against the coal sleigh, but that the latter by being suddenly turned towards the sidewalk the hinder end either slipped down, as the plaintiff says, or was slewed down, as the other witnesses say, upon the stage sleigh; and thus caused the collision which injured the plaintiff. If then the accident was not the result of any negligent or careless construction of the vehicle upon which the plaintiff was riding, and if the collision with the coal sleigh by which he was injured resulted from the slipping of the coal sleigh down upon the stage sleigh, or from the slewing of the hinder end of the former upon the latter, the collision is in nowise attributable to the negligence of the defendants or their servants, and we must look for some other ground upon which the action can be maintained. This brings us to consider the real question in controversy in the action. In assigning the first cause of action, in his complaint, the plaintiff says " that the said stage sleigh was negligently, carelessly and improperly provided by the said company with a certain ledge, or foot board running along the sides thereof, for passengers to ride thereon, and upon which passengers were negligently and carelessly allowed to ride, or induced to ride, by the said company, their agents and servants. And this plaintiff alleges that by such negligence and carelessness he was, on the day aforesaid, induced and allowed to ride and stand on the said stage sleigh as a passenger, and on the said ledge or foot board thereof, and was not so safely conveyed, but on the contrary, while on said passage and while so standing on said foot board, the said foot board was struck and broken in pieces by the contact or collision of another sleigh coming from an opposite direction, by which collision and breaking this plaintiff was thrown from said foot board and sleigh, breaking his arm and leg," &c. The ledge here spoken of is sometimes called a ledge by the witnesses, sometimes a

foot board, and at other times a fender. It was in fact a combination of both foot board and fender. It is thus described by the witness John Stephenson, the sleigh and omnibus maker: "The fenders are continued to the rear. The arrangement of the fenders was made in such a manner that the conductor could pass all around the sleigh and collect the fare from inside passengers. The first sleigh had no hand rail and the fender less projecting, and we found in use that people would jump on and fall off, from not being able to keep hold. The hand rail was put on to avoid such accidents, and the fender was then made a broad board passing over the cross-pieces. That made it slippery, as the snow and ice would accumulate on it, and persons fell off. The reason of a double rail was to let the snow down and make a better footing. The outer rail is five inches and the inner three inches wide. This is the most approved mode of construction. Before the wide fender was adopted it was found that wheels would strike the body, and the fender was widened so as to keep other vehicles away and prevent injury to passengers." Seats were provided, inside of the sleigh, for 28 or 30 passengers, and it also appeared that when these seats were full passengers would take their places on the fenders, and the company collected the usual fare from them. From these fenders they also entered and occupied the seats inside, as they were from time to time vacated by those leaving seats. When the plaintiff got upon the sleigh there were no vacant seats. The inside was crowded to excess. One of the witnesses says it was unreasonably full. The plaintiff himself describes the condition of things; I quote from his testimony. "I came out of my house, No. 38 Bond street, a little before 9 A. M. I waited till two or three sleighs had passed. They were filled, outside and in. I was familiar with the sleighs of this line. I do not know whether it was the second or third sleigh. I got on the outside. Finding it was impossible to get a seat inside, I was obliged to get outside. This was either the second or third sleigh that had come along since I was waiting. The sleighs were crowded,

inside and outside, and on the string boards. The sleighs that passed were so full that I could not get inside, or ride outside. I mean on what they call the fenders. The fenders were filled, on the other sleighs. When the sleigh came along on which I got on, the left side was vacant and the other side full. The inside was full to excess, and one man sat with his feet towards the center and his back towards the driver or box. It was entirely full so you could not get a little child in. Mr. Sutton got on when I did. When I got on, I held on the rail with my right hand, and my left hung down; that is the way it was broken. The driver stopped for me. I stopped him. At that time I could not have found a place inside." According to his own showing the plaintiff deliberately and voluntarily took his place upon the fender upon the outside of the sleigh. He was not crowded into that position from one which he had obtained inside and out of danger. He was not invited to go there, nor was he put there, by the agent of the company. After seeing two other sleighs pass, and with which he says he was quite familiar, he stopped the sleigh and took the position in which the collision with the coal sleigh found him. And it will be seen presently that in any other position upon the sleigh he would have remained unhurt. The company were in nowise responsible for the crowd of passengers seeking conveyance, on that morning. It resulted, necessarily, from the condition of the streets, incumbered and embarrassed with the snows of two recent storms. We were not told, upon the argument, what was the duty of the defendants' driver at the time the plaintiff stopped him and stepped upon the fender of the sleigh. He might, it is true, have disregarded his request and passed on; or he might have used persuasion or force to prevent the plaintiff from taking and occupying a place dangerous to his safety. But I submit that if this was a negligent omission on the part of the driver, it was one which the plaintiff procured and approved, and for which he is quite as responsible and culpable as the driver. · It may be said, (indeed it was said upon the argument,) that the fenders were

provided as a place to carry passengers. Evidence was given by the plaintiff to show that passengers frequently rode upon them and paid the usual fare. The defendant, on the other hand, gave evidence to show they were designed for a very different purpose. Now if the purpose and the uses of these fenders was an open, unsettled, disputed question, (which I think it was not,) the defendants had a right at least to have it submitted to and passed upon by the jury. They asked the judge, at the close of the evidence, to instruct the jury that it was for them " to determine whether the hand rail was placed upon the sleigh to invite passengers to ride upon the fenders, or to protect such as might ride thereon." He declined, and the defendants' counsel excepted. It was also said that the sleigh was improperly and negligently constructed, because the fenders were of such a kind that with the aid of the hand rail passengers were induced to stand, and did stand upon them. The gravamen of the plaintiff's complaint is that he was "induced and allowed"—these are his words—to stand on such fender as a passenger. The proof, however, affirms, and there was no evidence of an opposite kind, that the fenders are indispensable for the protection of the body of the sleigh and of the passengers riding therein. Indeed it is notorious that to a vehicle without wheels and axles, fenders are as indispensable safeguards as they are to a ship lying alongside of a wharf, beaten by the winds and tides. The theory of this argument is, that fenders outside the body of the sleigh, and any thing else upon which passengers may stand or to which they may cling, is sufficient evidence of malconstruction and negligent omission, to entitle a passenger " allowed" to stand thereon, to recover for an injury caused solely by the misconduct of a third person. I do not recognize the reason or the legal force of such a rule, for it ignores the necessity of all care and all prudence on the part of the passenger, and implies the total absence of the instinct of self-preservation inherent in all rational creatures.

The collision found the plaintiff in the same situation in

which he says he placed himself. He cannot say that a sense of the hazards of his position was not present to his mind, for Stephen B. Sutton, a witness who entered the sleigh at the same time with the plaintiff, says he got over the rail because he did not want to have his legs broken by riding outside, and told "Mr. Spooner it was a burlesque on riding in a sleigh, to ride on the outside and run the risk of having one's legs broken." There was no discrepancy in the evidence, as to the manner in which the plaintiff was injured. It is thus described by Henry Tomes, one of the plaintiff's witnesses : " I saw the coal sleigh coming up, on the left hand side. The string piece of the coal sleigh was higher than the guard of the stage, and swept along and knocked Mr. Spooner off." His left arm was fractured, above the elbow, his right leg broken below the knee, and he was otherwise seriously injured. It is manifest, therefore, that the injury is attributable to the position in which the plaintiff had placed himself, and that had he occupied a place inside the sleigh he would have remained entirely unharmed." In *Haring* v. *The New York and Erie Rail Road Company,* (13 *Barb.* 9,) the plaintiff was nonsuited upon the trial because it appeared that her intestate had driven his horse and sleigh at a rapid rate across the line of a rail road, at the point where the collision occurred, without taking any care or precaution against the probability of a train of cars approaching. The court affirmed the nonsuit, and declared the rule to be well settled that where the carelessness and imprudence of the person injured contributed to the injury, an action for damages could not be sustained. In the more recent case of *Dascomb* v. *The Buffalo and State Line Rail Road Co.,* (27 *Barb.* 221,) it was also held that a plaintiff living about the fourth of a mile from a rail road track, and owning a farm divided by the track, who left his house with a horse and wagon and drove across the track without taking any precaution to see whether a locomotive was approaching, and was injured, was guilty of gross carelessness, and could not recover for the injury. It was also

held that it was the duty of the court to have nonsuited the plaintiff. In *Mackey* v. *New York Central Rail Road Co.,* (*Id.* 528,) the intestate was driving his team towards the rail road crossing, and was told by a witness that the cars were coming. He turned his head towards the witness, then struck his horses with the lines and went upon the track, and was killed by the locomotive. The court decided that the plaintiff, his administratrix, could not recover, saying, " In such a case a party is bound to exercise care, diligence and foresight in proportion to the danger to be avoided and the fatal consequences involved in his neglect." I am not able to reconcile the plaintiff's claim to recover in this action with the principle of these cases, and many others to which I might refer. The fender upon which he voluntarily placed himself, and from which he was thrown, was not made as a place to seat or stand passengers. As its name imports, it was constructed as a defense, to receive and ward off the crash and pressure of adverse and outside forces. And if the plaintiff, with full notice and knowledge of the danger, chose to put himself upon this fender so as to receive the assaults of these forces upon his own person, whatever may have been the misconduct of the company, in other respects, he is guilty of gross imprudence and misconduct himself, which either caused or contributed to the injury, and cannot recover.

The defendants also requested the judge, at the close of the evidence, to instruct the jury that if they " find that the place upon the sleigh occupied by the plaintiff was known to him, before he got upon it, to be unsafe in case of accident, the plaintiff was as much bound, in the exercise of proper care, to avoid taking the position, as if notified not to do so by the company." The court declined so to direct the jury, and the defendants again excepted. This request embodied a correct legal proposition having reference to the purposes for which the fenders were erected. If they were not the places provided for the conveyance of passengers, and the plaintiff knew, or had notice from others, that the place upon them was danger-

ous, the company were under no obligation to communicate to him formally information of which he was possessed already. What particular instruction or charge was given (if any) to the jury we do not know, for none appears upon the printed case. I attach no particular importance, however, to the omission of the judge to charge as requested; for I think the defendant's motion for a nonsuit, when the plaintiff rested, should have been granted.

There should be a new trial, with costs to abide the event.

[Dutchess General Term, May 14, 1860. *Lott, Emott* and *Brown,* Justices.]